ENTERED ON DOCKET
R. 79 (a)

FEB 2 5 2005

BY: _kh_

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

FILED
FEB 2 4 2005
IN THIS OFFICE
Clerk U.S. District Court
Greensboro, N. C.
By _____

| | | |
|---|---|---|
| QWEST COMMUNICATIONS CORP., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:04CV903 |
| | ) | |
| CITY OF GREENSBORO, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on Defendant's motion to dismiss Plaintiff's action brought under 42 U.S.C. § 1983, alleging a violation of (1) 47 U.S.C. § 253(c); (2) the dormant Commerce Clause of the United States Constitution; and (3) Plaintiff's due process rights under the Fifth and Fourteenth Amendments [docket no. 7]. Since there has been no consent, the court must deal with the motion by way of a recommended disposition. Plaintiff has responded in opposition to Defendant's motion, and the matter is ripe for disposition. For the reasons discussed herein, I will recommend that the court grant the motion to dismiss in part and deny the motion in part.

### Background

The following allegations by Plaintiff are assumed to be true for purposes of Defendant's motion to dismiss:

Plaintiff Qwest Communications is a telecommunications corporation that is

organized and exists under the laws of Delaware, with its principal place of business in Denver, Colorado. Compl. ¶¶ 1, 3. Defendant City of Greensboro ("the City") is a municipal corporation organized and existing pursuant to the laws of North Carolina and is a political subdivision of North Carolina. Compl. ¶ 13. Plaintiff provides telecommunications services throughout the nation, including in Greensboro. Compl. ¶ 12. Plaintiff and other telecommunications providers in Greensboro traditionally provide services to consumers by installing telecommunications facilities in the City's public rights-of-way. Compl. ¶ 2. Like other telecommunications providers, Plaintiff operates in the City's public rights-of-way pursuant to the terms of a Franchise Agreement with the City. The Franchise Agreement is authorized under Ordinance Chapter 28.1 of the City's Code of Ordinances ("the Ordinance"). Compl. ¶ 3. Plaintiff has been operating under the terms of the Franchise Agreement since July 21, 1998. Compl. ¶ 3. In this suit Plaintiff alleges that the terms of the Ordinance and the Franchise Agreement violate section 253 of the Federal Telecommunications Act of 1996 ("the FTA"), 47 U.S.C. §§ 151 et seq., which states generally that a local government may not "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," see section 253(a), but that a local government may manage the public rights-of-way or require "fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis," see section 253(c). Plaintiff contends that certain terms

-2-

of the Franchise Agreement and the Ordinance have the effect of prohibiting Plaintiff's ability to provide telecommunications services to the City and that the fees imposed against Plaintiff are discriminatory and not competitively neutral. For instance, under the Franchise Agreement Plaintiff is required to pay non-cost-based fees to the City, while at least one other telecommunications provider is not required to pay those fees; Plaintiff is required to install, at its own expense, "conduit and pull tape" for the City's ownership and use; and Plaintiff is required to furnish a $15,000 bond to guarantee the faithful performance of its obligations under the Franchise Agreement. Compl. ¶¶ 32, 43. Furthermore, the Ordinance gives the City unfettered discretion to approve or deny the renewal of any franchise; gives the City the right to regulate Plaintiff's employment practices and procurement activities; and gives the City the right to install communications facilities and maintain them free of charge upon the poles or other above-ground facilities owned by Plaintiff. Compl. ¶¶ 5, 6. Plaintiff is attacking the Franchise Agreement and Ordinance in two differing ways: by arguing that they are void as preempted by section 253 pursuant to the Supremacy Clause of the United States Constitution (Claim I) and by bringing a section 1983 action alleging a violation of section 253 (Claim II).[1]  Plaintiff also

---

[1] Article VI, cl. 2, of the United States Constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

-3-

alleges that the Franchise Agreement and Ordinance, as applied to Plaintiff, violate the so-called "dormant Commerce Clause" of the United States Constitution as well as Plaintiff's due process rights under the Fifth and Fourteenth Amendments. Plaintiff seeks, among other things, declaratory relief invalidating the Franchise Agreement and the Ordinance as well as damages based on section 1983 and attorneys fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.[2] In response, the City has alleged a counterclaim for breach of contract, and the City now brings this motion to dismiss Plaintiff's claim for a violation of section 253 as well as Plaintiff's Commerce Clause and due process claims.

## DISCUSSION

In ruling on a motion to dismiss for failure to state a claim, it must be recalled that the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the action. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F. Supp. 811, 813 (M.D.N.C. 1995). At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor. *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 327 (4th Cir. 1996).

Dismissal under 12(b)(6) is generally regarded as appropriate only if it is clear

---

[2] Section 1988 allows the prevailing party a reasonable attorneys fee as part of the costs "[i]n any action or proceeding to enforce a provision of Section[ ] . . . 1983."

that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *McNair*, 95 F.3d at 328 (noting that the proper question is whether in the light most favorable to the plaintiff, the complaint states any valid claim for relief); *Food Lion*, 887 F. Supp. at 813. Stated differently, the issue is not whether the plaintiff will ultimately prevail on his claim, but whether he is entitled to offer evidence to support the claim. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

Generally, the court looks only to the complaint itself to ascertain the propriety of a motion to dismiss. *See George v. Kay*, 632 F.2d 1103, 1106 (4th Cir. 1989). A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *See Bolding v. Holshouser*, 575 F.2d 461, 464 (4th Cir. 1978). Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege any facts which set forth a claim.

Defendant's Motion to Dismiss the Section 1983 Action Alleging a Violation of Section 253

Here, Plaintiff is attempting to invalidate the Ordinance and Franchise Agreement in two ways. In Claim I, Plaintiff alleges that the Ordinance and Franchise Agreement are preempted by section 253 pursuant to the Supremacy Clause. In Claim II, Plaintiff alleges a suit directly under 47 U.S.C. § 253 based on Defendant's alleged violation of subsection (c) of that section. Furthermore, Plaintiff

-5-

is attempting to enforce its alleged rights under subsection (c) through 42 U.S.C. § 1983.[3] The City has not challenged Plaintiff's preemption claim in its motion to dismiss. Instead, the City contends that section 253 of the FTA does not provide for a private right of action; therefore, Plaintiff may not recover for a violation of section 253(c) through section 1983. It is appropriate to note here that there is a distinction between allowing a suit in federal court based on a preemption argument only and allowing a suit to be brought directly under a federal statute alleging a violation of the statute. A federal statutory private right of action is not required where a party seeks to enjoin the enforcement of a state or local law on the ground that the law is preempted by a federal law. *See Wright Elec., Inc. v. Minnesota State Bd. of Elec.,* 322 F.3d 1025, 1028 (8th Cir. 2003). In other words, "[a] claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity. In contrast, an implied private right of action is a means of enforcing the substantive provisions of a federal law." *Western Air Lines, Inc. v. Port Auth. of N.Y. & N.J.,* 817 F.2d 222, 225 (2nd Cir. 1987). Furthermore, if a private right of action is available under section 253, then the right is presumptively enforceable through section 1983, and the plaintiff may be able to recover attorneys fees through section 1998. *See Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002). If,

_____

[3] Section 1983 "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blessing v. Freestone,* 520 U.S. 329, 340 (1997). It does not, however, in itself create any substantive rights. *Beck v. City of Durham,* 129 F. Supp. 2d 844, 849 (M.D.N.C. 2000).

-6-

however, the law is simply preempted by the Supremacy Clause, there can be no recovery of attorneys fees through section 1983. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (noting that the Supremacy Clause is not "a source of any federal rights" and, therefore, "of its own force, does not create rights enforceable under § 1983") (citation and internal quotation marks omitted); *Maryland Pest Control Ass'n v. Montgomery County, Md.*, 884 F.2d 160, 163 (4th Cir. 1989) (per curiam) ("We hold that federal preemption of local ordinances pursuant to the Supremacy Clause is not actionable under Section 1983. Therefore, there can be no award of attorney's fees under Section 1988."). Thus, the practical effect of a finding by this court that Plaintiff has a private right of action under section 253, that is in turn enforceable through section 1983, is that Plaintiff may be able to recover attorneys fees, whereas a finding of preemption alone will not allow for recovery of attorneys fees.

The touchstone for determining whether a section 1983 remedy is available for the violation of a federal statute is whether Congress intended to create a federal right under the statute in question. *Gonzaga*, 536 U.S. at 285. Thus, this court must first determine if Plaintiff has any enforceable rights provided by section 253, particularly, whether Plaintiff may recover against Defendant for an alleged violation of subsection (c) of that section. Although the circuits appear to agree that there is no express grant of a private right of action under the FTA for alleged violations of section 253, the circuits have come to differing conclusions as to whether a private

-7-

right of action is implied. *Compare TCG Detroit v. City of Dearborn*, 206 F.3d 618, 624 (6th Cir. 2000) (finding an implied private right of action under section 253); *Spring Telephony PCS., L.P. v. County of San Diego*, 311 F. Supp. 2d 898, 911 (S.D. Cal. 2004) (same); *NextG Networks of New York, Inc. v. City of New York*, No. 03 Civ. 9672 (RMB), 2004 WL 2884308, at *9 (S.D.N.Y. Dec. 10, 2004) (same); and *Cox Communications PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1272, 1282 (S.D. Cal. 2002) (same), *with Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1266-67 (10th Cir. 2004) (finding that there is no implied private right of action under section 253); *Qwest Communications Corp. v. City of Berkeley*, 202 F. Supp. 2d 1085, 1096 (N.D. Cal. 2001) (same); *GST Tucson Lightwave, Inc. v. City of Tucson*, 950 F. Supp. 968, 971 (D. Ariz. 1996) (same). This circuit's court of appeals has not yet addressed the issue.[4] For the following reasons, this court finds that there is no implied private right of action for an alleged violation of section 253(c).

The Test For Determining Whether A Private Right of Action Exists

It is well established that private rights of action to enforce federal laws must be created by Congress, either explicitly or implicitly. *See Alexander v. Sandoval*,

---

[4] The court has found only one other district court decision in this circuit involving an ordinance that allegedly violated section 253(c). In *Bell-Atlantic Maryland, Inc. v. Prince George's County, Maryland*, the district court found that the ordinance at issue was preempted by the FTA. 49 F. Supp. 2d 805 (D. Md. 1999), *vacated on other grounds*, 212 F.3d 863 (4th Cir. 2000). The court made no finding, however, as to whether a private right of action is implied under section 253 and whether that right is enforceable through section 1983. Indeed, it does not appear that the plaintiff in that case attempted to recover under section 1983.

-8-

532 U.S. 275 (2001). In determining whether Congress has implied a private right of action in a federal statute, courts initially weighed the following four factors articulated by the Supreme Court in *Cort v. Ash*: (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create or deny such a remedy; (3) whether implying a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is in an area of law traditionally relegated to the states. 422 U.S. 66, 78 (1975). Since *Cort v. Ash*, the Supreme Court has emphasized that the overarching factor is congressional intent; hence, the other three factors are relevant only to the extent that they elucidate that intent. *See, e.g., Thompson v. Thompson*, 484 U.S. 174, 179 (1988) ("The intent of Congress remains the ultimate issue. . . ."); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15-16 (1979) (stating that "what must ultimately be determined is whether Congress intended to create the private remedy asserted"); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979) (stating that the "central inquiry" is "whether Congress intended to create, either expressly or by implication, a private cause of action"). Since *Cort v. Ash*, the Supreme Court has further observed that in determining Congressional intent, courts must look to the text and structure of the federal law. For instance, courts must focus on whether the statutory text contains "'rights-creating' language." *Sandoval*, 532 U.S. at 288. "Rights-creating language" is language that "explicitly confer[s] a right directly on a

-9-

class of persons that include[s] the plaintiff." *Cannon v. University of Chicago*, 441 U.S. 677, 690 n.13 (1979). Thus, "[f]or a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Gonzaga*, 536 U.S. at 284 (quoting *Cannon*, 441 U.S. at 692 n.13). Even where a statute is phrased in such explicit rights-creating terms, however, a plaintiff suing under an implied right of action still must show that the statute manifests an intent "to create not just a private right but also a private remedy." *Id.* (quoting *Sandoval*, 532 U.S. at 286). Furthermore, if the statutory structure provides a discernible enforcement mechanism, a court may not imply a private right of action because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. As the Court noted in *Sandoval*, such suggestion may be "so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would-be plaintiff 'a member of the class for whose benefit the statute was enacted') suggest the contrary." *Id.* (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145 (1985)). With these principles in mind, the court now turns to its analysis of section 253.

The Federal Telecommunications Act of 1996

Congress passed the FTA in 1996 "to end the monopolies in local telephone services and to benefit consumers by fostering competition between telephone companies in cities throughout the United States." *AT&T Communications of the*

-10-

*Southwest, Inc. v. City of Dallas*, 8 F. Supp. 2d 582, 585 (N.D. Tex. 1998). Thus, in passing the FTA, Congress intended that market competition, rather than state or local regulations, would primarily determine which companies would provide the telecommunications services demanded by consumers. *See In re Classic Tel., Inc.,* 11 F.C.C.R. 13082, ¶ 25 (F.C.C. 1996). To carry out this goal, Congress adopted sweeping restrictions on the authority of state and local governments to limit the ability of telecommunications companies to do business in local markets. *See AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999) ("States may no longer enforce laws that impede competition."); *City of Dallas*, 8 F. Supp. 2d at 591 ("Legislative history reveals that Congress's intent was to remove all barriers to entry in the provision of telecommunications services by preempting all state and local legal requirements that directly or indirectly prohibit market entry."). To this end, through section 253 of the FTA, Congress expressly preempted all state and local statues, regulations, and other legal requirements that may prohibit or have the effect of prohibiting any entity from providing telecommunications services. *See, e.g., New Jersey Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 241 (3rd Cir. 2002) (declaring a local ordinance void as preempted by section 253).

The provision of the FTA at issue here, entitled "Removal of barriers to entry," provides, in relevant part:

> (a) *In general*
> No State or local statute or regulation, or other State or

-11-

local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) *State regulatory authority*

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) *State and local government authority*

Nothing in this section affects the authority of a State or local government to manage the public rights of way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights of way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) *Preemption*

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

To be sure, the structure of section 253 is confusing, and courts have struggled with its interpretation. *See Qwest Communications Corp. v. City of Berkeley*, 202 F. Supp. 2d at 1089 ("As a preliminary matter, it is worth noting that § 253 is not a model of clarity."). Courts have generally observed that subsections (b) and (c) are framed as exceptions to the general prohibition stated in subsection (a), giving states and localities authority to retain some control over telecommunications services as

-12-

long as they act in a nondiscriminatory and competitively neutral manner. Furthermore, some courts have recognized that subsection (c) should be interpreted as a so-called "safe harbor" for localities. For instance, the Ninth Circuit has described the structure of section 253 as follows:

> Section 253 begins with a broad prohibition against state and local regulation followed by certain narrow exceptions that leave a "safe harbor" for limited local regulation. One of these safe harbors, established by § 253(c), allows a local government to manage and collect fees for the use of public rights-of-way by telecommunication providers.

*City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1170 (9th Cir. 2001). The FCC has also issued the following "Suggested Guidelines for Petitions for Ruling under Section 253 of the Communications Act":

> In preparing their submissions, parties should address as appropriate all parts of section 253. In particular, parties should first describe whether the challenged requirement falls within the proscription of section 253(a); if it does, parties should describe whether the requirement nevertheless is permissible under other sections of the statute, specifically sections 253(b) and (c).[5]

The enforcement clause for section 253 is set out in subsection (d), which allows for preemption by the FCC of any statute, ordinance, or regulation that "violates" subsections (a) or (b). *See* 47 U.S.C. § 253(d). Subsection (c) is noticeably absent from the preemption provision of subsection (d). This omission has led some courts to conclude that Congress intended to allow for a private right of action to be brought

---

[5] *Available at*
http://www.fcc.gov/Bureaus/Common_Carrier/Public_Notices/1998/fcc98295.txt.

-13-

in federal district court for alleged violations of subsection (c). Applying the principles set forth in *Cort v. Ash*, with Congressional intent as the overarching factor, this court respectfully disagrees with those courts and concludes that there is no implied private right of action for alleged violations of section 253(c).

The court first considers the text and structure of section 253 to determine whether Plaintiff is one of the class for whose especial benefit the section was enacted. As evidenced by its title, the FTA clearly governs the telecommunications industry. Furthermore, section 253 clearly applies specifically to protect telecommunications providers from state and local regulations that impede competition. Nevertheless, as the Tenth Circuit recently noted in *Qwest Corp. v. City of Santa Fe*, the language of section 253 focuses more on restricting the conduct of local authorities than it focuses on granting benefits to telecommunications providers. 380 F.3d at 1275-77. As the *Qwest Corp. v. City of Santa Fe* court stated:

> Section 253 contains nothing analogous to the language of the rights creating statutes noted by the Supreme Court. For instance, in *Gonzaga* the Supreme Court referred to Title IX of the Education Amendments of 1972 as an example of a statute creating individual rights through its "unmistakable focus on the benefitted class." That statute states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." The language of the [FTA] is quite different; it focuses on limiting the actions of local government[,] not on protecting a benefitted class.

*Id.* at 1265 (citations omitted). *See also Qwest Communications Corp. v. City of*

-14-

*Berkeley*, 202 F. Supp. 2d at 1093 (examining the legislative history of section 253 and stating that "[i]t is clear, then, that states and localities–not telecommunications providers–were the intended beneficiaries of subsection (c), which was passed in order to provide some room for states and localities to control public rights of way and to be fairly compensated for the use of public property"). Indeed, the structure of section 253 shows that subsection (c) is meant to serve as a defense by local governments to an action under subsection (a). As stated by another court, "Congress intended [section 253(c)] to be a defense for municipalities against claims that such municipalities have erected barriers to entry. . . . Thus, the requirement that regulation of public rights-of-way must be done on a competitively neutral and nondiscriminatory basis is a condition of the defense, not an element of a violation." *GST Tucson Lightwave, Inc.*, 950 F. Supp. at 970. In sum, this court finds that the language of section 253 does not indicate an intent to create rights for telecommunications providers to sue directly under subsection (c), and this factor weighs against finding an implied private right of action under section 253.

A further examination of the structure of section 253 and the FTA weighs against finding an implied private right of action under section 253(c). First, the clear language of section 253 provides for enforcement by the FCC through the enforcement provision of subsection (d), set forth above, and section 257, which requires the FCC to identify and eliminate market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications

-15-

services and information services and further requires the FCC to periodically review regulations and statutory barriers. 47 U.S.C. § 257(a), (c). Furthermore, Congress has stated that its purpose in passing the FTA was to regulate interstate and foreign commerce and provide safe and efficient services, to be executed and enforced by the FCC. *See* 47 U.S.C. § 151. Thus, the text of the FTA itself evinces a specific intent by Congress to give the FCC authority over telecommunications regulatory issues rather than to create private claims under the Act. The court notes that when Congress did intend to create private rights of action under a specific section of the FTA it did so explicitly.[6] *See, e.g.*, 47 U.S.C. § 274(e); 47 U.S.C. § 258(b); 47 U.S.C. § 252(e)(6). Thus, the court finds that the text and structure of the FTA do not evince an intent to allow for a private right of action under section 253(c).

Furthermore, the court finds nothing in the legislative history that reveals a clear intent to create a private right of action under section 253(c).[7] As noted

---

[6] It is true that the FTA's section 255, which mandates access by persons with disabilities, expressly states that there shall be no private right of action to enforce its requirements. In *TCG Detroit v. City of Dearborn*, the Sixth Circuit noted this fact and concluded that "[t]he resulting implication is that the neighboring section 253(c) . . . from which such limiting language is conspicuously absent, does confer such a right." 206 F.3d at 623. Under this logic, however, a private right of action would be allowed under every section in the FTA that does not expressly prohibit such an action. *See Qwest Communications Corp. v. City of Berkeley*, 202 F. Supp. 2d at 1092 n.6.

[7] The court notes that the FTA was passed as an amendment to the Federal Communications Act of 1934. Notably, the Supreme Court has been reluctant to find implied private rights of action under the Federal Communications Act. *See Maydak v. Bonded Credit Co.*, 96 F.3d 1332, 1333 (9th Cir. 1996) ("In 1941, the Supreme Court formulated a presumption against private actions under the Act, stating that the Federal Communications Act of 1934 'did not create new private rights' and that 'private litigants have standing only as representatives of the public interest.'") (quoting *Scripps-Howard*

-16-

previously, in finding an implied private right of action, some courts have considered it significant that section 253(d) allows for FCC preemption of subsections (a) and (b), but that it does not give the FCC preemption authority over subsection (c). These courts conclude that the failure to grant FCC preemptive authority over local governments under subsection (c) reveals Congress's intent to allow for private rights of action under that subsection. *See, e.g., TCG Detroit*, 206 F.3d at 623. The legislative history shows, however, no such intent. As initially proposed, subsection (d), which appeared in the Senate version of the bill, broadly specified that the FCC could preempt enforcement of both state and local laws that were merely inconsistent with section 253. Thus, the FCC was granted preemption authority over subsections (a), (b), and (c) under the Act as originally proposed. *See Bellsouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1190 (11th Cir. 2001). Some senators were concerned that giving the FCC preemption authority under subsection (c) would burden local governments by requiring them to travel to Washington D.C. to defend their ordinances. Senators Feinstein and Kempthorne drafted a version of the proposed Act that struck the FCC's jurisdiction to preempt both state and local regulations. *See Town of Palm Beach*, 252 F.3d at 1190; 141 CONG. REC. S8134-01, S8169 (daily ed. June 12, 1995) (statement of Sen. Feinstein). In response, Senator Gorton proposed a more limited alteration, which

---

*Radio, Inc. v. F.C.C.*, 316 U.S. 4, 14 (1942)).

retained the FCC's right to preempt state laws but which took away the FCC's right to preempt local regulations. Senator Gorton's alterations passed as the current section 253. In describing the proposed alteration, Senator Gorton stated that the proposed section 253(c) would "preserve[] to local governments control over their public rights of way. It accepts the proposition . . . that these local powers should be retained locally, that any challenge to them take place in the Federal district court in that locality and that the [FCC] not be able to preempt such actions." 141 CONG. REC. S8206-02, S8213 (daily ed. June 13, 1995) (statement of Sen. Gorton). Some courts have construed Senator Gorton's remarks to mean that the altered language would create a private right of action directly under subsection (c). This court finds that a more reasonable interpretation of Senator Gorton's remarks is that Senator Gorton merely meant to give the federal district courts, rather than the FCC, authority to rule on the issue of preemption. Senator Gorton further stated that his proposed amendment "does not impact the *substance* of the first three subsections of this section at all, but it does shift the *forum* in which a question about those three subsections is decided." 141 CONG. REC. S8206-02, S8212 (daily ed. June 13, 1995) (emphases added). As the court noted in *Qwest Communications Corp. v. City of Berkeley*:

> It seems highly unlikely that Senator Gorton's amendment, intended to shield local governments from overly burdensome scrutiny or new costs in their efforts to control their public rights-of-way, would simultaneously but silently create the ability of telecommunication providers and/or individual consumers to file suit against the local governments [in]

-18-

> federal court under § 253(c).  Under the FTA, these private plaintiffs
> would potentially be entitled to damages and attorney's fees, whereas
> the FCC is only entitled to preempt the challenged ordinance under
> subsection (d).

*Qwest Communications Corp. v. City of Berkeley*, 202 F. Supp. 2d at 1095-96.  This

court agrees with the reasoning by the court in *Qwest Communications Corp. v. City*

*of Berkeley* and finds that the legislative history does not show a clear intent by

Congress to create a private right of action under section 253(c).

As for the third *Cort* factor–whether implication of a remedy would be

consistent with the underlying purposes of the legislative scheme–it may be that

allowing a private right of action under section 253(c) would be consistent with the

FTA's stated purpose of promoting competition in the telecommunications market.

Nevertheless, preemption challenges through the Supremacy Clause will serve the

same purpose because the end result will be the same–if a local regulation violates

subsection (c) it will be invalidated as preempted just as it would be invalidated if a

plaintiff were allowed to sue directly under section 253.  Finally, as for the fourth *Cort*

factor–whether the cause of action is one relegated to state law in an area basically

a concern of the states, Congress intended the FTA to be national in scope.  Thus,

this factor weighs in favor of implying a private right of action.  This fourth factor,

however, is "dwarfed by the absence of evidence of legislative intent to do so."  *See*

*Qwest Communications Corp. v. City of Berkeley*, 202 F. Supp. 2d at 1092.

In conclusion, the court finds that Congress did not intend to imply a private

-19-

right of action under section 253. As stated above, refusing to find a private cause of action in section 253 does not leave Plaintiff without a remedy. Plaintiff is still free to pursue its claim that the Ordinance and the Franchise Agreement are preempted by the FTA. Of course, the rub is that Plaintiff may not recover attorneys fees through section 1988. In sum, Defendant's motion to dismiss Plaintiff's section 1983 action based on an alleged violation of section 253 should be granted.

Commerce Clause

The court next considers Defendant's contention that Plaintiff fails to state a claim for a violation of the dormant Commerce Clause of the United States Constitution. The Commerce Clause of the United States Constitution provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. Although "phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 98 (1994). Thus, with certain exceptions, the negative or so-called "dormant" Commerce Clause prohibits states from discriminating against the free flow of interstate commerce. In determining whether a state law discriminates against interstate commerce, discrimination is defined as the differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. *See Beskind v. Easley*, 325 F.3d 506, 514 (4th Cir.

-20-

2003). To determine whether a state or local law violates the dormant Commerce Clause, courts apply a two-tiered approach. *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (4th Cir. 2001). Under the first tier, a state or local law is per se invalid if it is facially or practically discriminatory in its purpose. If the state law has an impact on interstate commerce but is neither discriminatory on its face nor in practical effect, the second tier analysis applies. Under the second tier, courts must balance the burden on commerce against the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under the second tier analysis, a state law will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*

Here, in support of its dormant Commerce Clause claim, Plaintiff does not appear to be arguing that the Ordinance and Franchise Agreement are facially invalid. Instead, Plaintiff alleges that the Franchise Agreement and the Ordinance, as applied to Plaintiff, impose a burden on interstate commerce, and the burden clearly outweighs their benefits, if any, to the public. Compl. ¶¶ 56, 35-40. Plaintiff alleges that the franchise fees imposed upon it are discriminatory and not competitively neutral because such fees are not required of all telecommunications providers in the City and that at least one other telecommunications provider is assessed no franchise fee, while other providers are assessed percentage-of-

-21-

revenue fees, in comparison to the per-linear-foot fees assessed to Plaintiff.[8] *See* Compl. ¶¶ 35-39. The court finds that it would be inappropriate to dismiss Plaintiff's dormant Commerce Clause claim at this stage because, assuming an effect on interstate commerce exists, discovery is needed to yield facts that will show whether the restrictions contained in the Ordinance and Franchise Agreement impose an excessive burden on commerce that exceeds any putative local benefit. *See Synagro-WWT, Inc. v. Rush Township, Penn.*, 204 F. Supp. 2d 827, 843 (M.D. Pa. 2002) ("Because at this stage of the proceedings we are not in the position to judge either the Ordinance's effect on interstate commerce or the extent of the local benefits of the Ordinance, we will sustain the claim in order to have the aid later on of a more fully developed record."); *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 255 (D.N.J. 2000) (denying a motion to dismiss a dormant Commerce Clause claim where the effects on commerce and the local benefits of the law were yet unclear). Therefore, it is recommended that Defendant's motion to dismiss the dormant Commerce Clause claim be denied.

---

[8] Plaintiff does not specifically allege that it is an "out-of-state" provider, but it does allege in another part of the Complaint that its principal place of business is in Colorado. Compl. ¶ 12. Furthermore, Plaintiff alleges that other telecommunications providers operating under franchise agreements with the City, such as Adelphia Business Solutions of North Carolina and Time Warner Telecom of North Carolina, are not subject to the same fees as Plaintiff. *See* Compl. ¶¶ 38, 40. Although Plaintiff does not clearly allege that those providers are "in-state" providers, the court will draw all inferences in favor of Plaintiff and assume that these are in-state telecommunications providers.

Due Process Violation

Finally, the court considers Defendant's contention that Plaintiff fails to state a due process claim under the Fifth and Fourteenth Amendments. Here, in support of its due process claim, Plaintiff incorporates its factual allegations regarding the terms of the Ordinance and Franchise Agreement that allegedly violate section 253. Plaintiff further alleges that "Qwest has a valid right to use the City's public rights-of-way and to provide telecommunications services in the City"; that due process "prohibit[s] the City from depriving Qwest of its vested property rights in pursuing its proper business interests, without due process of law"; that the "City's imposition and enforcement of its telecommunications regulations alleged herein has deprived, and will continue to deprive, Qwest of its vested property rights without due process of law"; that "[a]s a result of the City's conduct, Qwest has been and will be impeded in its ability to provide telecommunications services to the public and has suffered and will suffer irreparable damage to its goodwill and reputation"; and "[i]n addition, Qwest has lost, and will continue to lose, customers and income in an unquantifiable sum as a direct and proximate result of the City's enforcement of its unlawful and invalid regulations." Compl. ¶¶ 60, 63, 64.

First, the court notes that the due process clause of the Fifth Amendment applies to action by the federal government.[9] *See Jenkins v. Trustees of Sandhills*

---

[9] The "takings clause" of the Fifth Amendment does apply to the States through the Fourteenth Amendment, but Plaintiff does not allege a Fifth Amendment "taking" in the Complaint. *See Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994).

-23-

*Cmty. Coll.*, 259 F. Supp. 2d 432, 444 n.8 (M.D.N.C. 2003). Thus, any due process violation must be grounded in the Fourteenth Amendment's due process clause. While the Fourteenth Amendment protects against deprivations of property without due process, it does not itself create a property interest. Rather, the nature and extent of a property interest is determined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Garner v. City of Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992). Indeed, to establish a viable claim that substantive due process has been denied by the City, Plaintiff must set forth (1) a cognizable property interest, rooted in state law; and (2) an arbitrary and capricious deprivation of that right. *Scott v. Greenville County*, 716 F.2d 1409, 1418 (4th Cir. 1983). Moreover, the property interest claimed must be more than a "unilateral expectation," it must be a "legitimate claim of entitlement." *Biser v. Town of Bel Air*, 991 F.2d 100, 104 (4th Cir. 1993) (quoting *Board of Regents v. Roth*, 408 U.S. at 577 (internal quotations omitted)).

In support of its motion to dismiss, Defendant argues, among other things, that Plaintiff has not alleged the existence of a cognizable property right and that Plaintiff has not identified or cited to any state laws providing it a property right in the provision of telecommunications services with the City. It is true that in the Complaint Plaintiff does not identify the state law that is the source of its alleged property rights. Plaintiff does allege, however, that it is operating pursuant to the

-24-

terms of a franchise with the City, and the North Carolina courts have clearly recognized "a franchise as property, the use and enjoyment of which is entitled to protection as any other property right." *Stillings v. City of Winston-Salem*, 311 N.C. 689, 692, 319 S.E.2d 233, 236 (1984); *Boyce v. City of Gastonia*, 227 N.C. 139, 145, 41 S.E.2d 355, 359 (1947) (stating that a "license to engage in business or practice a profession is a property right that cannot be taken away without due process of law"). Thus, the court finds that Plaintiff has sufficiently pled the existence of a cognizable property right by operating under the terms of a franchise with the City.

Nevertheless, the court agrees with Defendant that Plaintiff has not alleged that it has been deprived in any way of its property right. In support of its Fourteenth Amendment due process claim, Plaintiff alleges that "[t]he City's imposition and enforcement of its telecommunications regulations . . . has deprived, and will continue to deprive, Qwest of its vested property rights without due process of law." Compl. ¶ 63. Plaintiff further alleges that "[a]s a result of the City's conduct, Qwest has been and will be impeded in its ability to provide telecommunications services to the public and has suffered and will suffer irreparable damage to its goodwill and reputation." Compl. ¶ 64. The terms of the Ordinance and the Franchise Agreement about which Plaintiff is now complaining, however, were in place at the time that Plaintiff entered into the Franchise Agreement in 1998, and Plaintiff does not allege that Defendant has altered those terms in a way that are now impeding Plaintiff from operating under the Franchise Agreement. Indeed, Plaintiff's own factual allegations

-25-

show that Plaintiff continues to operate in the City under the terms of the Franchise Agreement. Furthermore, as Defendant points out, Plaintiff has admitted that on January 10, 2000, the parties entered into a "Linear Footage Agreement," which extended the linear feet of cable allowed by the original Franchise Agreement. *See* Qwest's Reply to the City's Counterclaim 8; Ex. B to City's Counterclaim. In sum, Plaintiff does not allege any facts tending to show that since the time it was vested with its property rights that the City has taken any action to deprive Plaintiff of those property rights. In other words, even if the Franchise Agreement and the Ordinance violate and are, thus, ultimately held to be preempted by the FTA, Plaintiff currently enjoys the same property rights under its franchise that it enjoyed when those rights first vested. Thus, the court agrees with Defendant that Plaintiff does not state a claim for a due process violation under the Fourteenth Amendment.

For all these reasons, **IT IS RECOMMENDED** that the court **GRANT** the motion to dismiss Plaintiff's section 1983 action based on a violation of section 253(c) of the FTA and a violation of Plaintiff's due process rights under the Fourteenth Amendment. It is further recommended that the court **DENY** the motion to dismiss Plaintiff's dormant Commerce Clause claim.

_Wallace W. Dixon_
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC

February 23, 2005

-26-